**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**

JORGE MEJIA DE AVILA,

    *Plaintiff,*

v.

UNUM LIFE INSURANCE COMPANY
OF AMERICA,

    *Defendant.*

Case No.: *2:26-cv-00014-SCM*

## COMPLAINT

Plaintiff, Jorge Mejia de Avila ("Plaintiff"), by and through the undersigned counsel, hereby states his Complaint against the Defendant, Unum Life Insurance Company of America, as follows:

## JURISDICTION AND VENUE

1. Plaintiff's claims arise from the wrongful denial of his long-term disability ("LTD") benefits under an employee group disability benefit plan sponsored by his employer, Progress Rail Services Corporation ("Progress Rail"), a subsidiary of Caterpillar Inc., and he seeks to recover benefits due under the terms of the plan, to enforce and clarify his rights, and for a full and fair review.

2. Plaintiff Jorge Mejia de Avila is a citizen and resident of the Commonwealth of Kentucky who, at all times relevant to this action, was employed by Progress Rail at its facility located in Covington, Kentucky, and was a participant in the Progress Rail LTD Plan (the "Plan"). The Plan was administered in and throughout Kenton County, Kentucky.

3.      Defendant Unum Life Insurance Company of America ("Unum") is an insurance company to whom Progress Rail delegated its fiduciary responsibility of making benefit determinations for the Plan and which underwrote and insured benefits payable under the Plan. Unum may be served at its offices located at 2211 Congress Street, Portland, Maine 04122.

4.      This is an action arising under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., to recover disability benefits due to Mr. Mejia de Avila under the Plan, to clarify his rights to future benefits under the Plan, and to recover attorneys' fees and costs.

5.      This Court has subject matter jurisdiction pursuant to Section 502(e)(1) of ERISA, 29 U.S.C. § 1132(e)(1), and 28 U.S.C. § 1331.

6.      Venue is proper in this District pursuant to Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), in that the breaches occurred within this District, the Policy was sponsored by Progress Rail in this District, and Unum transacts business and administers claims for participants residing and working in this District.

**<u>PARTIES</u>**

7.      Plaintiff, 58 years old at the time, worked for Progress Rail as a Track Assembler in Covington, Kentucky until approximately September 14, 2023, when he stopped working due to disabling conditions including chronic shoulder and elbow injuries, neck pain, migraines, inner ear disorders including vestibular hypofunction syndrome, benign paroxsymal positional vertigo, and 3rd window syndrome, and related physical impairments.

8.      Plaintiff's position requires frequent lifting of up to 50 pounds, repetitive bending, overhead reaching, use of impact tools, and other physically demanding tasks consistent with rail assembly work.

9. At all times relevant, Plaintiff was a participant within the meaning of Section 3(7) of ERISA, 29 U.S.C. § 1002(7), in the Plan.

10. At all relevant times, the Plan provides for long-term disability ("LTD") benefits and has been an "employee welfare benefit plan" within the meaning of Section 3(1) of ERISA, 29 U.S.C. § 1002(1).

11. At all relevant times, Unum is and has been the claims administrator of the Plan within the meaning of Section 3(16)(A) of ERISA, 29 U.S.C. § 1002(16)(A).

12. At all relevant times, Unum has been a fiduciary within the meaning of Section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A).

13. Upon information and belief, Unum is both the claims adjudicator and the claims payor, and operates under a conflict of interest.

14. LTD benefits under the Plan have been insured pursuant to a policy issued by Unum.

## THE PLAN

15. Unum issued a policy to eligible employees of Progress Rail identified as Policy No. 943119 031 effective January 1, 2024. ("the Policy"). A copy of the Policy is attached as Exhibit A.

16. As a Track Assembler for Progress Rail, at all relevant times, Plaintiff was provided with long term disability insurance coverage under the Plan, which is insured and administered by Unum Life Insurance Company of America.

17. Plaintiff paid premiums for coverage under the Unum Policy at all relevant times, up to the date his employment ended, and at least until April 2024.

18.     Under the Policy, Coverage normally begins at 12:01 a.m. on the later of: 1) "the date you are eligible for coverage, if you apply for insurance on or before that date; or 2) "the date you apply for insurance, if you apply within 31 days after your eligibility date".

19.     If a participant is absent from work on the date coverage would normally begin, "due to injury, sickness, temporary layoff or leave of absence, your coverage will begin on the date you return to active employment".

20.     However, the Policy also contains a "Continuity of Coverage" provision which states:

> ***WHAT IF YOU ARE NOT IN ACTIVE EMPLOYMENT WHEN YOUR EMPLOYER CHANGES INSURANCE CARRIERS TO UNUM? (Continuity of Coverage)***
>
> When the plan becomes effective, Unum will provide coverage for you if:
>
> - you are not in active employment because of a sickness or injury; and
>
> - you were covered by the prior policy.
>
> Your coverage is subject to payment of premium.
>
> Your payment will be limited to the amount that would have been paid by the prior carrier. Unum will reduce your payment by any amount for which your prior carrier is liable.

21.     Under the terms of the Policy, there is a 180-day waiting period to become eligible for LTD benefits.

22.     Unum pays 60% of monthly earnings up to $5,000 per month to participants who are Disabled under the Policy.

23.     Under the Policy, "Disability" or "Disabled" is defined as follows:

  i.     You are disabled when Unum determines that you are limited from performing the material and substantial duties of your regular occupation due to your sickness or

injury; and you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.

ii. After 24 months of payments, you are disabled when Unum determines that, due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training, or experience.

## STATEMENT OF FACTS

### Unum's History Of Bias

24.     Unum's actual conflict of interest and financial bias in its claims' evaluation process goes back decades.

25.     Starting in 1994, Provident, Paul Revere, Unum, and other companies conspired to reverse staggering financial losses incurred in the disability business by denying more claims. In the 1980s, disability insurers like Provident aggressively marketed and sold "own occupation" policies, which insured individuals against disabilities from their own specific occupational specialties. As "preferred professional" policies, they commanded higher premiums, which could then be invested to earn substantial returns in an era of high interest rates.

26.     But in the 1990s, interest rates dropped, claims poured in, and insurance companies sustained heavy losses. Provident's losses were so severe that in December 1993, it took a $423 million charge to meet its anticipated future liabilities on claims arising from own-occupation policies. The CEO resigned and a new CEO named Harold Chandler was hired. Mr. Chandler came from banking and had essentially no background in insurance claims.

27.     Provident's Senior Vice President of Risk Management, Tom Heys, in a confidential memo, explained the problem was that Provident sold policies without regard to the claims it would ultimately need to pay. He wrote:

The . . . 1980s were characterized by a highly competitive, growth oriented market environment. Product provisions and underwriting were liberalized . . . as . . . competitors . . . attempted to grow share. The product sold . . . can neither be canceled nor its price raised, covering the own occupation of the individual . . . In hindsight, it is generally viewed that the policies sold during the period were poorly underwritten and underpriced. This was common among competitors, but Provident seems to have taken it a few steps further. Provident in many cases, won the market share battle and, in fact, was very successful in certain high population growth states, such as California . . . Provident was also slow to recognize that deteriorating experience on this block of business in terms of taking early action. As a result, it is felt that, as other companies were tightening their offerings, many of the poor risks went to Provident.

28.     In its 1993 10-K amended financial report filed with the SEC, Provident explained that it underestimated its exposure on "own occupation" policies, it could no longer obtain high investment returns on its premiums, and one of the principal solutions was to "improve claim handling procedures." Mr. Heys described Provident's claims department as being engulfed in a "crisis atmosphere" due to the "continuing high level of new claims."

29.     In response to this "crisis," Provident undertook a deliberate plan to lower its claim payments by denying more claims. To do so, it developed practices and procedures that had the specific goal of denying more claims.

30.     The engineer of this scheme was Provident's new Senior Vice President of Claims, Ralph Mohney, who was appointed in 1994 by Provident's CEO, Harold Chandler. Chandler and Mohney set about to "tighten up the claims-paying process." Mohney admits that he did not know how to process a disability insurance claim, only 25 years of experience in Provident's financial departments.

31.     He developed 10 disability claims "performance objectives." The first objective was to increase the number of claim "terminations." Mohney measured the volume of terminations by the amount of reserves that Provident could eliminate from its books through claim

terminations. Thus, Mohney's response to more new claims was simple: "deny even more claims." To accomplish these nefarious goals, he created a ten-point "Claim Improvement Initiatives" memo. Mohney had high expectations of the money he could save Provident. In a May 1995 memo to CEO Chandler, he reported that "a number of claim improvement initiatives have been identified and are currently being implemented. . .We believe that aggregate improvements in the 5% – 10% ($30 million – $60 million annually) range are possible "once the initiatives have been fully implemented." Mohney's superior, Heys, reported to Chandler that "we have a good chance of meeting our goal of $132 million of terminations for the quarter" and "terminations should be much stronger . . . We have a good shot at making our goal, which is 10% above last year."

32.    Mohney exceeded expectations. In the following months and years, Mohney submitted reports to his superiors of his success at denying more claims. His monthly reports described the "favorable," "highly favorable," and "unfavorable" results, depending on the level of terminations. For example, a typical Mohney report read, "Claim results were highly favorable in October . . . Terminations reached $45.1 million, the highest level ever for non-scrub months and 9% above the average." Mohney's superior reported to the president of the company: "Claim terminations3 in May were $41 million, which is the highest they have ever been in a non-scrub month." "We will have a good quarter in DI [disability insurance] terminations. Continued institutionalization of claim management practices is reflected in the numbers."

33.    Mahone changed from using the word "terminations" and began using the term "resolution" instead, although the terms mean the same thing.

34.    By 1998, Provident had successfully reversed its losses. It became the biggest disability insurer in North America and was looking to get bigger. Provident's March 31, 1998 10-Q attributed its rising profits directly to Mohney's claims initiatives These claims initiatives

included more "independent medical examinations", the development of a "network" of IME physicians who specialized in "forensics" instead of physicians with an actual clinical practice, and the direct targeting of claims from own occupation policies and claims from physicians.[1] Special units, like the psychiatric claims units, orthopedic claims units, cardiac claims units, cancer claims units, and general medical claims units, were created to handle specific claims. These units were supposed to develop specialized techniques uniquely suited to the management of these claims, and the members of these units would specialize in the specific types of injuries and sicknesses presented. Instead, consultants were hired to supervise the claims people and in-house medical doctors were hired. According to testimony and evidence, these consultants and medical advisors were trained to look for ways to deny claims. Many of the inhouse medical doctors have stock options and other benefits tied to the profitability of the insurance company, giving them an incentive to deny claims.

35.     Another Provident initiative was to "sharpen [its] legal defense" (in other words, paper the file or eliminate paper from the files) in cases with "bad faith/punitive liability in high exposure states" like Texas. However, Provident did not want to spend too much money on denying claims. Its goal was to limit the expenditure on claims to 2% of the reserves it saved through the termination. One of the most effective tools used by Provident was its weekly "roundtable meetings". Each claims adjuster was required to bring matters to the roundtable meeting, but no notes exist as to what happened during these meetings.

36.     These roundtable meetings, however, were intended to accomplish one purpose - the termination of an ongoing disability claim, and thus the saving of reserves. Dr. William Feist was on the medical staff of Provident for 14 years. In 1995, he was its Medical Director. He sat in

---

[1] These claims were identified as "known problem areas" and "poorly performing cells."

on the weekly roundtable meetings. Almost every claim that came before the roundtable had high reserve amounts. Dr. Feist was shocked and appalled by what transpired at these roundtable meetings. There was no effort to fairly evaluate the cases. The sole object of these meetings was to find a way to terminate a claim.

37.     In 1996, Provident acquired Paul Revere for $1.2 Billion.[2] It immediately began implementing its claims initiatives at Paul Revere's Worcester, MA office. Provident created a task force to ensure the successful implementation of the initiatives. The task force created a timetable for adoption of Provident's claims handling protocols, such as the roundtable reviews and the creation of a special unit to handle psychiatric claims.

38.     Provident trained Worcester medical personnel to help deny claims. They were instructed how to "challenge certification" - to disagree with a treating physician that his patient is disabled. Even if the adjuster agreed with the treating physician's conclusion that an insured was disabled, they were not allowed to write that conclusion in the file. Instead, they were instructed to focus on whether appropriate treatment was being pursued and when the insured might be able to return to work.

39.     Provident implemented various "performance measures" for the Worcester claims office, and monitored the number of IME's, surveillance, and roundtable reviews, as well as Mohney's net termination ratio.

40.     Provident sent Jeff McCall, the author of the ERISA memo, to Worcester to oversee the psychiatric unit. One of McCall's first mandates was to subject all-new high exposure claims to roundtable review and to track the number and dollar amount of claims terminated due to roundtable. The focus on money sunk to new lows. Each adjuster was required to submit a "hit

---

[2] https://www.nytimes.com/1996/04/30/business/provident-agrees-to-acquire-paul-revere-for-1.2-billion.html.

list" a running list of claims that were projected for closure in the coming months, along with the amount of reserves held on those claims.

41.     As with Provident's Chattanooga office, the initiative worked. In his monthly reports, Mohney tracked the "key activities" in the Worcester office, including the quarterly dollar amount of terminations, and the reserves released because of roundtable reviews. In his March 23, 1998 report, Mohney reported that February's claim results in Worcester were "highly favorable" and "resolutions were up roughly $3 million above the 1997 average."

42.     In 1999, Provident merged with Unum Life Insurance Company to become UnumProvident, the largest disability insurer in the country. Ralph Mohney became the head of Unum's claims department and instituted his culture of denying claims throughout the company. Dr. Patrick McSharry was an in-house consultant hired to work in the Chattanooga claims department. He reviewed claim files throughout the country. He reported to Dr. Robert Anfield, medical director of all Unum in-house consultants. He testified that the procedures in Chattanooga were the same throughout Unum.

43.     In a deposition, Dr. McSharry described a company-wide practice designed to deny claims. The claims department was broken down into specific units. Each unit in the claims department had monthly and quarterly denial target numbers to meet. The numbers consisted of the total reserves that would be taken off the books upon the denial of claims and resulting in savings for Unum. A unit reached its numbers by denying claims with reserves totaling the target numbers for the month or quarter. As the month or quarter ended, there was intense pressure on the claims units to deny claims to meet these targets. The claims persons who denied the most reserves in claims were seen as the "top producers". Those units that did not meet their numbers were viewed unfavorably by claim executives. Sometimes at the end of a month or quarter, the

claims people would be required to come to work on Saturday to get enough claims closed to meet the target numbers. Dr. McSharry produced an example of a hit list of claims targeted for denial at his deposition.

44.     Because the general medical team had monthly target closures of $2.5 Million to $5 Million, there was significant pressure on claims handlers to close claims. Unum's roundtables were a raucous affair, with claim handlers yelling, "Close the claim! Close the claim!" Dr. McSharry would respond by making a slashing motion across his throat, indicating the expression, "Cut them off". Kim Boles, a senior claims specialist, would put her hands to her throat and yell, "Cut them off!" in mini round table meetings.[3] Dr. McSharry explained that the role of in-house medical consultants was to write reports so that claims personnel could deny claims. Indeed, the claims personnel were the "business partners" of the in-house staff.

45.     Medical consultants were not to provide independent evaluations. Instead, they were given a bonus and stock option incentives tied to Unum's profitability; their job was to make their "business partners" happy by supporting denials and enabling them to meet their target numbers. Dr. McSharry was repeatedly criticized for expressing his actual opinion instead of opinions that the claims department wanted to hear. He described a claims department that had a policy to deny claims by any means necessary.

46.     Unum outlined its compensation plan in a series of documents. In April 2002, UnumProvident prepared its Management Incentive Compensation Plan and Performance Management Plan ("2002 Compensation Plan"). The 2002 Compensation Plan outlined that minimum company earning thresholds had to be met for award eligibility. At least 50% of performance was based on Return on Equity.

---

[3] This is different from the phony roundtables Unum would hold when taking clients on guided tours of its building.

47.     Unum was the subject of substantial criticism and review in 2002-2004 for improper claims handling processes.

48.     On September 2, 2003, three state insurance regulators launched an investigation of Unum's claims handling practices, with 49 other jurisdictions listed as participating jurisdictions, investigating whether Unum's disability income claims handling practices: "reflected systemic 'unfair claim settlement practices' as defined in the NAIC Unfair Methods of Competition and Unfair and Deceptive Acts and Practices in the Business of Insurance Model Act (1972) or NAIC Claims Settlement Practices Model Act (1990)."[4]

49.     After conducting a review of Unum's files, the multistate examination identified the following areas of concern:

    a.  Excessive reliance upon in-house medical professionals;

    b.  Unfair construction of attending physician or IME reports;

    c.  Failure to evaluate the totality of the claimant's medical condition; and

    d.  Inappropriate burden placed on claimants to justify eligibility for benefits… in which benefits were denied by the Companies on the grounds that the claimant had failed to provide "objective evidence" of a disabling condition.

50.     The multistate investigation was resolved in November 2004 through a Regulatory Settlement Agreement ("RSA") which imposed a $15 million penalty and a Corrective Action Plan including 1) a claims reassessment process, 2) required permanent changes in claim organization and structure, 3) changes in corporate governance; 4) quarterly meetings between regulators and Unum.

---

[4] ARTICLE: FIFTEEN YEARS LATER -- DID THE UNUM GROUP IMPROVE ITS ERISA CLAIMS HANDLING PRACTICES?, 39 Miss. C. L. Rev. 199, 204

51.     In 2005, Unum agreed to an amendment to the RSA which imposed additional requirements.

52.     The RSA and the RSA Amendment required Unum to

i.      Increase emphasis on employee accountability for compliance with law;

ii.     Consider and give weight to all diagnoses and impairments and their combined effect on the whole person when evaluating medical data;

iii.    Give significant weight to the Social Security Administration's ("SSA") disability decision unless compelling evidence justifies disregarding it;

iv.     Give significant weight to attending physicians' opinions;

v.      Contact attending physicians to discuss disagreements;

vi.     Fairly interpret and apply information from attending physicians; and

vii.    Explain medical reasons for disagreeing with attending physicians.

51.     As it relates to "significant weight" to attending physician opinions, Unum agreed to give:

> significant weight to an attending physician's ("AP") opinion, If the AP is properly licensed and the claimed medical condition falls within the AP's customary area of practice, unless the AP's opinion is not well supported by medically acceptable clinical or diagnostic standards and is inconsistent with other substantial evidence in the record. In order for an AP's opinion to be rejected, the claim file must include specific reasons why the opinion is not well supported by medically acceptable clinical or diagnostic standards and is inconsistent with other substantial evidence in the record.

52.     In 2005, after the RSA was created, Unum created a Performance Based Incentive Plan ("PBI").

53. The 2005 UnumProvident Manager Toolkit ("2005 Toolkit"), for instance, documents the PBI in effect at that time. Unum outlined its business priority to give "attractive financial returns" to its owners. It created a Balanced Business Scorecard with targets for categories like:

    e.   Appeals Rate: what % of claims should be appealed

    f.   Appeals Upheld Rate: what % of appeals should be denied

    g.   New Litigation Rate: what % of claims should reach litigation

    h.   Reopen Rate: what % of claims should be reopened

54.    For instance, the target appeals rate for LTD claims was 10-14%. The target appeals upheld rate was 80-85%. This meant that Unum expected only 10-14% on denied claims to be appealed. Unum expected 80-85% of appeals to be denied. Of the appeals denied, Unum expected less than 1.5% to get into litigation.

55.    With these targets, Unum aligned its employees' goals to "share in the company's success through the PBI".

56.    Unum created a fixed pool for bonuses, in which one department's performance above target would reduce the other departments' bonus pool by that same amount. This created a race to the bottom as employees rushed to deny claims and appeals to meet these financial targets. Managers were assigned to "help employees line their performance plans with the business unit and company plan".

57.    Unum maintains a substantially identical performance plan to this day.

58.    The Unum Stock Incentive Plan governs awards of common stock and incentive stock options for Unum employees based on performance goals, including loss ratio and earnings, among other measures.

59.    A Committee is designated to administer the Plan and determine who gets the awards, the number of shares included in each award, and the terms and conditions of each award.

60.    The Unum Annual Incentive Plan's goal is "to motivate the participants to perform in a way that will enable the Company to reach or exceed its goals".

61.    As before, the 2015 Unum Annual Incentive Plan is based on the achievement of objectively determinable performance goals measured over 12 months. A Compensation Committee has the authority to establish goals and target awards and increase, reduce, or eliminate cash incentive awards. It can also pay other additional amounts or compensation to employees. For the incentive (cash bonus based on percentage of salary or range of dollar amounts) award, the Committee can reduce it for failing to meet financial or other economic goals. It can also adjust the performance goals for incentive awards to "mitigate…the impact...of losses". In other words, if too many claims are paid, the Committee can adjust goals to offset those "losses".

62.    Additional information and context to the 2015 Annual Incentive Plan is found in Unum's 2015 Proxy Statement. Annual incentive awards are created to motivate employees to achieve short-term corporate goals and individual objectives. This compensation is paid in cash. Long-term incentive awards are designed to motivate long-term performance and align the interests of management and stockholders. This compensation is awarded in restricted stock units and performance share units (PSUs) based on a corporate earnings threshold and individual performance.[5] However, neither the short term nor long term incentives are paid unless Unum achieves a specified level of performance. For 2014, the Compensation Committee established a $250 Million earning target performance requirement.

63.    The terms of the  Annual Incentive Plan remain substantially identical to this day.

64.    The terms of the Annual Incentive Plan and Proxy Statements prove that Unum continued to award cash bonuses and stock options based primarily on corporate profit objectives. The requirement of mandatory stock ownership means that Unum Medical Directors, who are

---

[5] Senior Unum officers are required to keep a fixed percentage of shares for a specified period.

senior officers, are conducting claim reviews, knowing that their decision also impacts their own pocketbook.

65.     Unum's approach has remained consistent. In 2018-2025, Unum's PBI encouraged Unum employees to focus on "business value" and to think "with the mindset of a business owner" who is interested in "strong stewardship of the Company's financial resources". Employees are expected to support all business initiatives. Employee bonuses are capped at $8M.

66.     Unum's 2025 Proxy Statement reveals that Unum's Annual Incentive Plan also remains largely unchanged:

67.     Disability claims units' performances are closely managed and communicated publicly.

68.     During quarterly Earnings Call with investors, for instance, Unum executives announce the profitability, based on the number of reserves released (i.e. open claim denials), of the closely monitored group and individual disability books of business for each quarter.

69.     For instance, in the 3rd Quarter call for 2025, CEO and Director of Unum announced that its "Closed Block" had resulted in an after-tax impact of $378 million increase in reserves due to "a series of actions taken to manage the block".

70.     The Executive VP and CFO announced "favorable" performance within the group disability block of business during the third quarter due to $105.8 million of "reserve releases" for that period, describing performance for the quarter compared to the "guidance" communicated to VPs, Directors, and DBS handling individual claims:

> The group disability release reflects the favorable recovery trends in long-term disability and we continue to believe recent levels of recoveries are sustainable. Reflecting these positive recovery trends, group disability produced adjusted operating earnings of $133.5 million in the quarter compared to $156.7 million a year ago. While down year-over-year, *results this quarter reflect a benefit ratio of*

*61.3%, in line with our low 60s guidance driven by continued strong recoveries.*

71.     Group and Individual Disability blocks of business are not only closely managed and watched at the investor level, but performance expectations and claim closure rates are monitored down to the individual level as well.

72.     Unum Assistant Vice Presidents (AVPs) overseeing the LTD claims department manage and are responsible for their entire book of business.

73.     Each AVP has approximately 8 Directors who report to them; and each Director has approximately 30 Disability Benefit Specialists who report to them.

74.     Each Disability Benefit Specialist manages approximately 50 claims in "actively managed" claim units.

75.     Unum creates various weekly, monthly, and quarterly reports that track its directors' and benefit specialists' progress in meeting corporate goals regarding the number of claims closed (i.e. denied) and "recoveries" released from reserves.

76.     The reports give the director and AVP a projection of closing claims through the end of the month and tell the director if he or she is ahead or behind the plan.

77.     Directors are expected to know their progress, which is discussed in weekly meetings.

78.     Put another way, Unum evaluates the performance of its directors based, at least in part, on the number of claims that they deny.

79.     AVPs and Directors track individual claims, have access to reports identifying anticipated "recovery" dates falling within their book of business and when those claimants' open claim has surpassed an anticipated recovery date.

80.     AVPs and Directors are informed verbally by higher management what the monthly, quarterly, and/or annual recovery targets or expectations are and routinely track progress towards the monthly and/or quarterly goals.

81.     AVPs and Directors know that their income, as well as the income of the benefit specialists within their unit, are dependent upon, at least in part, how many claims are terminated and meeting corporate expectations.

82.     AVPs and Directors also track individual claims, maintain significant authority and oversight of claims, and are authorized to decide claims or determine how a claim should be processed.

83.     AVPs and Directors often exclude their correspondence about a particular claim from the NaviLink system, even when the correspondence and/or subject matter is not administrative.

84.     Once a claimant attempts to open an LTD claim, a reserve is placed on that claim.

85.     Therefore, refusing to open a LTD claim would count in favor of DBS, Director, and AVP performance metrics attributed to bonus and incentive pay awards, as does closing out an undecided claim.

86.     Upon information and belief, the claim closure and recovery "guidance", expectations, and/or goals upon which Unum employees' compensation is, at least in part, measured relies on the claim closure rates at Unum before the 2004 RSA and 2005 RSA Amendment.

## Plaintiff's LTD Claim History

87.     Unum is in the insurance business and sells various forms of life and disability insurance. The promise of disability insurance is to provide income protection if an insured is disabled by injury or sickness.

88.     Implicit in the promise of Unum's policy is that it will timely, fairly, and objectively adjust and pay a covered claim.

89.     If in doubt about the cause or nature of the insured's disability, Unum implicitly promises to investigate the claim fairly and objectively and promptly pay if the claim meets the policy requirements.

90.     Implicit in the promise of Unum's policy, and found within Unum's internal claim manual and operating procedures, Unum claim adjusters are instructed to assist an employee perfect his claim for benefits.

91.     Plaintiff was employed by Progress Rail for over 12 years, working as a Track Assembler at the time of his injury causing disability.

92.     As an employee of Progress Rail, Plaintiff participated in the LTD disability insurance policy sponsored by his employer.

93.     Plaintiff became disabled and unable to work in his own occupation on or about September 15, 2023 and was out on STD leave until his attempted return to work on December 4, 2023.

94.     The next day, on December 5, 2023, Plaintiff again stopped working due to his disabling conditions and has remained continuously disabled since then.

95.     At the time of his injury in September 2023, Progress Rail sponsored a policy providing short- and long-term disability benefits administered by MetLife.

96. MetLife paid Plaintiff's STD claim under the STD policy issued by MetLife from September 15, 2023 to approximately March 21, 2024, when he exhausted the STD benefits available. *See* Exhibit B.

97. In December 2023, Progress Rail terminated its agreement with MetLife and entered into a successor agreement with Unum whereby Unum agreed to issue a certificate of coverage for short- and long-term disability benefits, effective January 1, 2024.

98. Plaintiff was continuously covered under a STD and LTD policy issued by MetLife through December 31, 2023, and was an active employee of Progress Rail at all relevant times prior to Unum's policy taking effect on January 1, 2024 and through the date he became eligible for LTD benefits after meeting the 180-day waiting period.

99. Immediately upon the MetLife policy terminating, Plaintiff became covered under the Unum Policy effective January 1, 2024 under the Continuity of Coverage provision.

100. Plaintiff's employer made Unum aware of Plaintiff's continuity of coverage and the underlying facts supporting his coverage under Unum's LTD policy. (*See, e.g.,* Exhibit C & D).

101. Under Unum's Continuity of Coverage provision in the Policy, effective January 1, 2024, Plaintiff was covered for LTD benefits because he met the terms of the Continuity of Coverage provision in the Policy.

102. Specifically, Plaintiff was out of work due to his sickness or injury and was continuously covered by the prior policy until January 1, 2024; and Plaintiff continued to pay all required premiums to Unum.

103.    Plaintiff's employer also determined that Plaintiff's restrictions and limitations prevented it from accommodating him to bring him back to work, and the employer continued to approve an accommodation through extended leave of absence. (*See* Exhibit E)

104.    On or about April 10, 2024, at the advice of his employer and MetLife, Plaintiff initiated a claim for LTD benefits with Unum by phone.

105.    Unum opened a STD claim for Plaintiff, and assigned it claim number 24300046. (*See* Exhibit F).

106.    Without reviewing or considering the Policy's Continuity of Coverage section, Unum denied Plaintiff's claim, styled as a short-term disability benefit claim, saying he was not eligible for coverage. (*See* Exhibit G).

107.    The STD denial letter substantially fails to follow ERISA's minimum standards required for a good faith claim evaluation and/or the mandatory claim regulations applicable to Plaintiff's claims and does not quote or rely on the relevant plan terms regarding continuity of coverage. See 29 C.F.R. 2560.503-1.

108.    The denial letter is not written in Spanish; despite Unum having knowledge that Plaintiff's English language comprehension is limited and he was unable to understand complicated policy terms in English.

109.    Plaintiff attempted to perfect his disability benefit claim through a mandatory appeal process on or about May 2, 2024 by submitting additional information to Unum.

110.    Unum refused to process the appeal.

111.    Plaintiff retained counsel and on or around March 27, 2025 Plaintiff's counsel attempted to initiate a claim for *Long-Term Disability* benefits by phone and letter.

112.    On the phone, the claim handler refused to provide a claim number or open an LTD claim or send the claim forms to Plaintiff's attorney. Upon information and belief Unum maintains a recording of the phone call.

113.    Despite being provided Plaintiff's counsel's phone, email, and mail address, Unum failed to provide the necessary claim forms or otherwise follow up with Plaintiff's counsel as promised on the phone.

114.    Plaintiff submitted the claim again in writing on May 27, 2025 without Unum's claim forms, requesting again that Unum "open a long-term disability (LTD) claim" and notifying Unum that "although his last day of work was December 4, 2023…[Plaintiff] was insured under the prior disability carrier at the time of transition" and "qualifies for coverage under the 'Continuity of Coverage' provision outlined in the Unum LTD plan document." (*See* Exhibit H)[6]

115.    Plaintiff concluded the letter by asking for "the necessary claim forms required to initiate his LTD claim". (*Id.*)

116.    To date, Unum has not sent any claim forms or processed Plaintiff's claim.

117.    Subsequent to the letter, Plaintiff learned of a different claim number: 26179072 via phone conversation with Unum representative, which was communicated to Plaintiff as the Long-Term Disability claim number.

118.    On or about June 26, 2025 Unum representatives spoke with Plaintiff's counsel, during which Unum could not provide any information about the new claim number 26179072 and informed Plaintiff's counsel that he could not provide any information to Plaintiff's authorized legal representative, would have to transfer the law office to an unidentified "specialist," despite

---

[6] The letter was inadvertently misdated; although it says "March 27, 2025" it was sent on May 27, 2025.

having received an acceptable form from Plaintiff authorizing Unum to communicate with Plaintiff's counsel about Plaintiff's claim.

119.     Unum representative, Kimi Morris, spoke with Plaintiff's counsel's office on or about July 1, 2025 during which Ms. Morris provided the same STD file number associated with claim number 24300046.

120.     On July 1, 2025, Ms. Morris responded that she was "only assisting the Benefits Specialists and [had] no power over claims." A copy of this correspondence is attached as Exhibit I.

121.     Plaintiff's counsel again asked for information about claim number 26179072, believed to be the long-term disability claim number based on Unum's representations. (*See* Exhibit J).

122.     On July 2, 2025, Unum's Lindsey M. Shaw notified Plaintiff's counsel that "this file was set up in error. As a result, it was cancelled, and no documentation was sent to your client. The file was considered duplicate to the file in which you received copies of the documentation" (referring to the STD claim number 24300046). (*See* Exhibit J).

123.     Although Unum was advised multiple times that Plaintiff had retained counsel, and received Plaintiff's signed designation of representation form, Unum contacted Plaintiff directly on or about July 18, 2025, advising Plaintiff to "appeal" STD claim no. 24300046 by July 18, 2025 with nothing more than the words "I appeal."

124.     The phone call makes no logical sense and demonstrates Unum's ineptitude because a) Plaintiff had already appealed the denial of "STD" claim no. 24300046 in May 2024; b) Unum had not made a decision, or even begun processing, his LTD claim; and c) Unum had

been advised on multiple occasions that Plaintiff retained counsel, and was in possession of the necessary authorization forms signed by Plaintiff to communicate directly with Plaintiff's counsel.

125.     On or about July 21, 2025, Plaintiff's counsel, with Plaintiff present, called Unum to ask about the information Unum gave to Plaintiff on July 18, again asking why the LTD claim had not been processed or assigned a claim number. Upon information and belief, this and all prior phone calls with Plaintiff or Plaintiff's counsel, are recorded.

126.     During the phone call, Plaintiff and Plaintiff's counsel were inexplicably  informed that STD claim no. 24300046 was now associated with the LTD claim Plaintiff's counsel had attempted to initiate by phone in March 2025 and letter in May and June, 2025.

127.     During the July 21, 2025 phone call, the Unum employee read notes from the July 18 phone call with Plaintiff, which was transcribed inaccurately and did not reflect the information communicated to Plaintiff via the interpreter, and without his attorney present.

128.     The Unum employee also inexplicably informed Plaintiff and Plaintiff's counsel during the July 21, 2025 phone call that a new claim number – 263122 – was initiated for STD benefits on July 2, 205 – the date Plaintiff's counsel explicitly asked for the LTD claim to be initiated.

129.     Even more confusingly, during the July 21 phone call, Plaintiff and Plaintiff's counsel were told that claim no. 263122, opened on July 2, 2025, had been denied at some undefined date.

130.     Neither Plaintiff nor Plaintiff's counsel  ever received any written correspondence from Unum about Plaintiff's LTD claim or a "STD" claim under claim no. 263122.

131.    Unum, Plaintiff, and Plaintiff's counsel ended the call with specific instructions to Unum to send a *letter* to Plaintiff's counsel providing a status update of his *long-term disability* claim.

132.    Unum never followed up with any such letter or additional information about the LTD claim.

133.    Plaintiff's counsel sent Unum a letter dated August 28, 2025, requesting the following information in writing:

1. what, to date, has been done with respect to his claim for LTD benefits;
2.  the name of the benefit specialist handling the LTD claim, with the email address and direct phone number associated with that specialist;
3. the accurate claim number associated with Mr. Mejia de Avila's LTD claim;
4. a copy of all correspondence Unum has generated regarding the STD and LTD claim to date; and
5. description of any outstanding information Mr. Mejia de Avila needs to submit for Proof of Loss under the Plan.

(*See* Exhibit K)

134.    With the August 28, 2025 letter, Plaintiff issued a 10-day notice under 29 C.F.R. § 2560.503-1(l)(2)(ii), asserting that Unum had failed to issue a timely decision within the maximum period permitted by ERISA and had not provided a full and fair review. Plaintiff requested a written explanation within ten days as to why Unum's ERISA violations were *de minimis*. (*Id.*)

135.    With the August 28, 2025 letter, Plaintiff also submitted all necessary medical and vocational evidence to establish Plaintiff's Proof of Loss and Disability under the Policy, including 345 pages of records to Unum *via* email and facsimile. (*See* Exhibit L).

136.    Plaintiff has not received any response to the August 28, 2025 submission or a decision determining Plaintiff's claim for LTD benefits starting in approximately April 2025.

137.     According to Unum's own internal guidance, used by LTD disability benefit specialists (DBS), one of the purposes of the Continuity of Coverage provision is to ensure employees are not penalized for the policy holder changing carriers while the employee is out of work due to total disability. (*See* Exhibit M)

138.     Unum's internal claims manual also directs Unum to consider the individual terms of the plan and make assessments based on the facts and policy terms, not make generalized assumptions. (*Id*.)

139.     Unum's internal claims manual further provides guidance on how to evaluate continuity of coverage claims, as well as process claims in a timely manner. (*See, e.g.,* Exhibit M & N)

140.     As a fiduciary and insurance company, core functions of the disability benefit specialists and Unum employees assisting with LTD claims, include:

     a.  timely and effectively communicate accurate information to claimants and their authorized representatives;
     b.  assist claimants and their authorized representatives submit all necessary information to perfect a claim for benefits;
     c.  pay all valid benefit claims;
     d.  evaluate individual policy terms and conditions before making claim eligibility determinations;
     e.  consider all information submitted to Unum by claimants in a fair and consistent manner;
     f.   follow applicable state and federal law
     g.  Comply with any applicable terms of the Amended Regulatory Settlement Agreement (Exhibit O and P).

141.     In addition, as part of a collective action against Unum brought by disability benefit specialists under the Fair Labor Standards Act, in which employees alleged they were misclassified as exempt employees and owed overtime wages, benefit specialists responsible for STD and LTD claims were required to affirm that their job duties included exercising discretion to interpret and apply the terms of each applicable policy to the claim.

142.     Unum has refused to review or interpret the Policy's Continuity of Coverage policy provision or exercise any independent discretion or analyze the specific facts of Plaintiff's claim.

143.     Instead, Unum refused to process Plaintiff's LTD claim, failed to follow applicable state and federal law and the plan terms, and did not respond to the 10-day notice letter as required by ERISA and the claim regulations.

144.     To date, *more than* 250 days have passed since Plaintiff's counsel called Unum to request that an LTD claim be opened and any necessary forms be sent to Plaintiff's counsel for completion; more than 180 days have passed since Plaintiff gave notice of his claim for LTD benefits and asked for all necessary forms in writing on May 27, 2025; and more than 100 days have passed since Plaintiff satisfied the Plan's Proof of Loss requirements to establish total disability under the LTD Policy and notified Unum of its severe deficiencies.

145.     Unum's extensive delay and refusal to process Plaintiff's LTD claim is not made in good faith.

146.     Unum's extensive delay and refusal to process Plaintiff's LTD claim violates 29 C.F.R. § 2560.503-1(b)'s obligation to maintain a reasonable claims procedures; 2560.503-1(f)(3)'s mandate that initial claim decisions be made within 45 days.

147.     At no time has Unum submitted a valid request for an extension to decide Plaintiff's LTD claim.

148.     Unum's policy of requiring a Plaintiff to prove eligibility before considering or opening a claim for benefits violates the Regulatory Settlement Agreement terms still in effect as well as Unum's internal claims manual.

149.     Unum's policy of requiring a Plaintiff to prove eligibility before considering or opening a claim for benefits violates 29 C.F.R. § 2560.503-1(b)'s obligation to maintain a

reasonable claims procedures; 2560.503-1(f)(3)'s mandate that initial claim decisions be made within 45 days, terms of the RSA still in effect, as well as Unum's own internal claims manual and the governing plan documents.

150.     Unum's internal policy and practice of communicating in English to Spanish speaking claimants and refusing to communicate with Plaintiff's authorized legal representative further violates 29 C.F.R. § 2560.503-1(b)'s obligation to maintain a reasonable claims procedures; and minimum claim standards necessary for a full and fair review under ERISA.

151.     Pursuant to 29 C.F.R. 2560.503-1(l) Plaintiff is deemed to have exhausted the administrative remedies available under section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure as it relates to his LTD claim for benefits.

152.     In addition, Plaintiff is entitled to *de novo* review of his eligibility for LTD benefits, as Unum has not exercised any discretionary authority.

## <u>CAUSE OF ACTION – 29 U.S.C. §1132(A)(1)(B)</u>

153.     Plaintiff incorporates all of the above allegations as if set forth herein.

154.     As Plan fiduciaries, Unum and the Plan are obligated to handle claims for the benefit of the Plan and Plan beneficiaries, and to deliver the benefits promised in the Plan. They are also obligated as fiduciaries to conduct their investigation of a claim in a fair, objective, and evenhanded manner.

155.     Plaintiff was covered under the Policy and eligible for benefits at all relevant times.

156.     Plaintiff became and has remained continuously disabled under the terms of the plan and entitled to LTD benefits in approximately April 2024 as a result of his injuries and illnesses.

157.     Plaintiff meets the Policy's terms and conditions for total disability benefits.

158.     Plaintiff submitted proof of claim and evidence of disability.

159.     Plaintiff's claim is deemed denied as a result of Unum's refusal to process or decide Plaintiff's claim.

160.     Plaintiff's claim is deemed denied as a result of Unum's egregious violations of ERISA and the implementing regulations, 29 C.F.R. § 2560.503-1.

161.     Unum's denial was made without substantial supporting evidence and was de novo wrong; the decision making process did not comply with 29 U.S.C. §1133's requirements or 29 C.F.R. § 2560.503-1.

162.     Plaintiff has exhausted all mandatory appeals and/or an appeal would be futile.

163.     At all material times, Unum was acting on behalf of the Plan and in its own capacity as the Insurer and Claims Administrator.

164.     Unum has not exercised any discretion and is not entitled to an abuse of discretion or arbitrary and capricious standard of review.

165.     Instead, the Court must conduct a *de novo* review.

166.     Unum's refusal to process or pay Plaintiff's valid LTD claim is a violation of ERISA, the claim regulations, and the terms of the Policy.

167.     Plaintiff is and at all relevant times was, disabled under the terms of the Plan.

168.     Unum's denial of Plaintiff's claim breached the Plan terms. Pursuant to 29 U.S.C. §1132(a)(1)(b), Plaintiff  is entitled to the LTD policy benefits to which he is entitled under the Plan, along with pre- and post-judgment interest, and attorney fees and costs  pursuant to 29 U.S.C. § 1132(g).

## PRAYER FOR RELIEF

Plaintiff, Jorge Mejia de Avila, prays for the following relief:

A.  That the Court enter judgment in Plaintiff's favor and against Defendant Unum and that the Court Order Defendant to account and pay all disability income benefits to Plaintiff in an amount equal to the contractual amount of benefits to which Plaintiff is entitled;

B.  That the Court Order Defendant Unum to pay Plaintiff's pre-and post-judgment interest on all benefits that have accrued prior to the date of judgment and enter judgment accordingly and that the Court reserve jurisdiction to enforce the equitable decree;

C.  The Court award Plaintiff his attorney fees and costs pursuant to 29 U.S.C. §1132(g); and

D.  That the Plaintiff recovers all other relief to which Plaintiff may be entitled.

Dated: January 15, 2026

*/s/ Claire W. Bushorn Danzl*
Clarie W. Bushorn Danzl, Esq. (0087167)
*Attorney for Plaintiff*
The Bushorn Firm, LLC
8110 Sycamore Street
Cincinnati, OH 45202
Phone: (513) 827-5771
Fax: (513) 725-1148
E-mail: cbushorn@thebushornfirm.com
